FILED

08/19/2025

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 24-0539

DA 24-0539

IN THE SUPREME COURT OF THE STATE OF MONTANA

2025 MT 185

GARY TEMPLE,

      Petitioner and Appellant,

   v.

STATE OF MONTANA,

      Respondent and Appellee.

APPEAL FROM:    District Court of the Eighth Judicial District,
                In and For the County of Cascade, Cause No. BDV-23-437
                Honorable Elizabeth A. Best, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

          Laura Reed, Attorney at Law, Missoula, Montana

          Joshua Van de Wetering, Attorney at Law, Missoula, Montana

      For Appellee:

          Austin Knudsen, Montana Attorney General, Katie F. Schulz, Assistant Attorney General, Helena, Montana

          Joshua A. Racki, Cascade County Attorney, Kory Larson, Deputy County Attorney, Great Falls, Montana

                        Submitted on Briefs:  May 7, 2025

                               Decided:   August 19, 2025

Filed:

                        _____
                                  Clerk

Justice Beth Baker delivered the Opinion of the Court.

¶1      Gary Temple appeals the Eighth Judicial District Court's denial of his petition for postconviction relief. Temple claims that the State failed to disclose impeachment evidence and to correct a witness's testimony. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

¶2      The State charged Temple with two counts of felony distribution of dangerous drugs based on two alleged transactions from November 2017. In April 2019, the State amended the charges to one count of felony distribution of dangerous drugs based on conduct between July 2017 and February 2018. During discovery, the State moved the court to allow it to excise portions of three discovery items that contained some information related to Temple and other information that was either not impeachment evidence or was related to other cases. The court set an in-camera inspection for May 9, 2019. Temple, his counsel, and the prosecutor were present for the in-camera inspection and the State's proposed excisions.

¶3      Among the documents that the State sought to redact were the police report by Detective Jack Hinchman, a lieutenant with the Cascade County Sheriff's Office who previously served with the Russell Country Drug Task Force, and the transcript of a March 2019 interview with Donny Ferguson, whom the State expected to call as a witness in Temple's trial. Participants in the March interview included Ferguson, Stephanie Fuller (the Deputy Cascade County Attorney), Detective Hinchman, Jason Holden (the federal defense attorney for Donny Ferguson), and Jessica Betley (the Assistant U.S. Attorney

2

General who prosecuted Ferguson in federal court). At this interview, Ferguson provided information on people involved in drug purchases and distribution—including Temple.

¶4 Relevant here, the court determined that, pursuant to § 46-15-328, MCA, the disclosure of the entirety of the transcript and of the police report by Detective Hinchman regarding Ferguson's March 2019 interview would result in a risk outweighing its benefits and "the material the State proposed to excise is nondiscoverable." The State then provided Temple's attorney with the redacted police report that shared the summary information from Ferguson's interview relevant to Temple, as well as a redacted interview transcript containing Ferguson's discussion of information regarding Temple. The documents redacted information that Ferguson provided regarding other people. Temple's defense counsel conducted a pretrial interview with Ferguson, during which Ferguson informed Temple's counsel that she was not expecting to receive benefits for her testimony.

¶5 Temple's case went to trial in December 2019. The State called four witnesses who had been involved in purchasing and dealing methamphetamine in Great Falls and three law enforcement officers who testified about controlled purchases they surveilled. Danielle Wilson and Derek Lohmeyer both testified to two controlled drug transactions in which Wilson purchased drugs from Temple. Outside the two controlled transactions, Wilson testified that Temple sold her drugs between October and December 2017. Lohmeyer also testified that Temple sold him methamphetamine on a separate occasion. Lohmeyer and Wilson both admitted that they had received benefits or expected benefits in exchange for their testimony. Brian Osborn testified to interactions with Temple during

the summer of 2017. He recounted two instances when he accompanied Temple to pick up or drop off drugs.

¶6 Luke Smith (an undercover narcotics officer with the Montana Department of Justice) testified that he drove Lohmeyer to one of the transactions. He did not see Temple but saw a vehicle that matched the description of Temple's truck. Detective Hinchman testified that he saw Temple in his truck after one of the controlled transactions. Great Falls Police Detective Thomas Lynch (a member of the Russell Country Drug Task Force) testified that he saw Temple at one controlled transaction and saw his truck near the other.

¶7 Ferguson testified that she currently was being held at the Cascade County Detention Center on federal charges for possession with intent to distribute and felon in possession of a firearm. She testified that she met Temple in summer 2017 to start supplying Temple with methamphetamine, which she did until around November or December 2017. She estimated that she sold him about ten pounds of methamphetamine during that time. Acknowledging that it had promised Ferguson immunity in exchange for her testimony, the State asked about other benefits:

> Q: And just to be clear, have you been promised anything by the State for your testimony here today?
>
> A: No.
>
> Q: We've given you immunity, but you're not pending any State charges; is that correct?
>
> A: No.
>
> Q: Has the U.S. Attorney's Office given you any deals to testify today?
>
> A: No.

4

Q: Why are you testifying today?

A: I've accepted responsibility for my actions for the last two and a half years that I've dealt drugs throughout the state of Montana. And I just feel that, you know, everybody else needs to accept their responsibility. I've taken the consequences for my actions.

¶8 In closing argument, the State addressed Lohmeyer's, Wilson's, and Osborn's motivations for testifying. Regarding Ferguson, the State said:

And then, of course, Donny's motivation for testifying she said was that she's already taken responsibility for what she did. Okay. She pleaded guilty and she's been sentenced on a possession with intent to distribute. And her motivation was that she thinks the Defendant should also be held accountable for his role in all of this.

¶9 Two weeks after Temple was convicted, AUSA Betley filed a motion in Ferguson's federal case for a sentence reduction under Fed. R. Crim. Pro. 35(b), which allows a court to reduce a sentence "if the defendant, after sentencing, provided substantial assistance in investigating or prosecuting another person."[1] The motion listed assistance that Ferguson provided in other cases as well as her testimony in Temple's trial and his verdict. The U.S. District Court granted the Rule 35(b) motion in January 2020 and reduced Ferguson's sentence.

¶10 The state court sentenced Temple in February 2020. Temple's counsel was unaware of the Rule 35(b) Order from U.S. District Court. Temple appealed his conviction on other grounds, and we affirmed. *State v. Temple*, 2022 MT 251N, 411 Mont. 386, 522 P.3d 424.

---

[1] Given the confidential and sealed nature of the U.S. District Court documents (like the Rule 35(b) motion and order), both parties submitted redacted briefing on appeal to this Court. While this Opinion references the sealed documents, "we have, to the extent possible, labored to protect the confidentiality of the records while simultaneously observing that any opinion of this Court must be public." *State v. Weisbarth*, 2016 MT 214, ¶ 1 n.1, 384 Mont. 424, 378 P.3d 1195.

Though it is unclear from the record how Temple's current counsel (who was not his trial counsel but represented him in his direct appeal) became aware of the Rule 35(b) documents, the federal court disclosed the documents to her with the order that they remain sealed.

¶11    Temple filed a petition for postconviction relief in August 2023.  Relevant here, he claimed that the State violated *Brady*[2] by withholding information about potential benefits that Ferguson might receive for her testimony at Temple's trial; that he was entitled to a new trial under *Napue*[3] because Ferguson testified falsely regarding potential benefits; and, in the alternative, that he was entitled to re-sentencing based on the State's failure to disclose Ferguson's sentence reduction prior to Temple's sentencing.  Paul Neal (Temple's state defense attorney), Detective Hinchman, Deputy County Attorney Fuller, AUSA Betley, and Holden all testified at the postconviction relief hearing.  Temple appeals the District Court's denial of his petition.

### STANDARD OF REVIEW

¶12    "We review a district court's denial of a petition for postconviction relief to determine whether the court's findings of fact are clearly erroneous and whether its conclusions of law are correct."  *Main v. State*, 2024 MT 215, ¶ 14, 418 Mont. 159, 556 P.3d 940.  "Findings of fact are clearly erroneous if they are not supported by

---

[2] *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194 (1963).

[3] *Napue v. Ill.*, 360 U.S. 264, 79 S. Ct. 1173 (1959).

6

substantial evidence, the court has misapprehended the effect of the evidence, or our review of the record convinces us that a mistake has been made." *Main*, ¶ 14.

## DISCUSSION

¶13    *1. Did the State violate* Brady *when it failed to inform defense counsel that the State's witness expected a reduction in her sentence?*

¶14    The landmark case of *Brady v. Maryland* established that the suppression of evidence favorable to the accused "violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. 83, 87, 83 S. Ct. 1194, 1196-97 (1963). A *Brady* violation requires three elements: (1) the evidence at issue was favorable to the accused; (2) the State suppressed the evidence (willfully or inadvertently); and (3) the evidence was material to guilt or punishment (otherwise stated, its non-disclosure prejudiced the defendant). *Strickler v. Greene*, 527 U.S. 263, 281-82, 119 S. Ct. 1936, 1948 (1999); *State v. Severson*, 2024 MT 76, ¶ 16, 416 Mont. 201, 546 P.3d 765.

**Evidence favorable to the accused**

¶15    Favorable evidence includes both exculpatory and impeachment evidence, such as evidence to show bias or interest by a government witness. *United States v. Bagley*, 473 U.S. 667, 676, 105 S. Ct. 3375, 3380 (1985). Impeachment evidence disclosed and used effectively "may make the difference between conviction and acquittal." *Bagley*, 473 U.S. at 676, 105 S. Ct. at 3380. "Evidence tending to undermine or impeach a key state witness is of particular favorability to the defense for purposes of a *Brady* analysis." *Severson*, ¶ 18.

¶16    In *Giglio*, an alleged co-conspirator of the defendant testified that nobody had promised him immunity, and he believed he still could be prosecuted. *Giglio v. United States*, 405 U.S. 150, 151, 92 S. Ct. 763, 764-65 (1972).   The prosecutor reiterated in closing arguments that the witness received no promises of immunity. *Giglio*, 405 U.S. at 152, 92 S. Ct. at 765.   The first prosecutor who dealt with the witness, however, had promised immunity if the witness cooperated. *Giglio*, 405 U.S. at 153, 92 S. Ct. at 765. The Court reasoned that, despite the second prosecutor's lack of knowledge, the prosecutor's office was an entity, and a promise made by one attorney was attributable to the entire office. *Giglio*, 405 U.S. at 154, 92 S. Ct. at 766.   The suppressed evidence was material because the case depended almost entirely on the witness's testimony and "evidence of any understanding or agreement as to a future prosecution was relevant to his credibility[.]" *Giglio*, 405 U.S. at 154-55, 92 S. Ct. at 766.

¶17    In *Bagley*, the state's two principal witnesses assisted in the undercover investigation of the defendant. *Bagley*, 473 U.S. at 670, 105 S. Ct. at 3377.   Affidavits by both witnesses, provided in pretrial discovery, stated that they had not been made any promise of a reward in exchange for their statements. *Bagley*, 473 U.S. at 670, 105 S. Ct. at 3377.   Years later, the defendant obtained contracts revealing that both witnesses had been paid. *Bagley*, 473 U.S. at 671, 105 S. Ct. at 3378.   Although the payment contracts were not signed by a government representative until after trial, they were signed by both witnesses seven months prior to trial. *Bagley*, 473 U.S. at 671, 105 S. Ct. at 3377-78.   The prosecutor's discovery responses thus "misleadingly induced defense counsel to believe"

8

that the witnesses could not be impeached based on "bias or interest arising from inducements offered by the Government." *Bagley*, 473 U.S. at 683, 105 S. Ct. at 3384.

¶18 In *Gollehon*, we affirmed that promises "made to a witness in exchange for testimony go directly to the credibility of the witness." *Gollehon v. State*, 1999 MT 210, ¶ 14, 296 Mont. 6, 986 P.2d 395 (overruled in part on other grounds by *Severson*, ¶ 16 n.5). "The duty of disclosure is dependent, however, upon an agreement or understanding with tangible benefits. Where there is no agreement, there is no duty to disclose[,]" and "gratuitous post-trial benefits . . . do not constitute a *Brady* violation." *Gollehon*, ¶¶ 14, 42.

¶19 The District Court explained that federal defense attorney Holden, AUSA Betley, and Deputy County Attorney Fuller all testified at the hearing that there was no agreement, and Detective Hinchman denied offering any benefits to Ferguson. It noted that "Temple did not call Ferguson and the record is silent as to Ferguson's motive to testify against Temple." Relying on *Gollehon*, the court reasoned that absent "evidence of a pre-trial agreement with tangible benefits," the petition failed on this issue. Temple argues that the District Court imposed an erroneously high standard for what constitutes an agreement for the purposes of impeachment evidence—as an expectation of a benefit may constitute *Brady* evidence—and that the record evidence demonstrates Ferguson expected a benefit for testifying. The State acknowledges the nuances between formal agreements and implied promises but argues that *Brady* and *Giglio* require, at a minimum, evidence that

9

the witness believed or hoped for a benefit for testifying for the prosecution—which the record here does not show.

¶20 Record evidence that shows a witness's expectation of a benefit implicates impeachment evidence subject to disclosure, even if the benefit has not yet occurred at the time of trial or the agreement is implied. *See Bagley*, 473 U.S. at 671-72, 105 S. Ct. at 3377-78; *Sivak v. Hardison*, 658 F.3d 898, 910 (9th Cir. 2011) (quoting *United States v. Shaffer*, 789 F.2d 682, 689 (9th Cir. 1986)) (reasoning that when evidence implies a tacit agreement between a witness and the government for his cooperation, failure to disclose still may violate *Brady*). Much of the testimony at the postconviction relief hearing discussed that it was ultimately up to the federal judge whether to grant the motion—a fact we find irrelevant. If a witness testifies at trial based upon a promise or expectation that the prosecutor will seek a reduction in their sentence, that is a motivation for testifying that may be used to impeach the witness's credibility. As such, that promise or that expectation is subject to *Brady* disclosure regardless of what the judge ultimately decides. In *Wearry*, for example, the witness seeking a sentence reduction in exchange for testimony and the police's promise to talk to the prosecutor was sufficient to constitute impeachment evidence because any juror "might have thought differently" upon learning of his motivation. *Wearry v. Cain*, 577 U.S. 385, 390, 394, 136 S. Ct. 1002, 1004, 1007 (2016).

¶21 This aligns with *Gollehon*, where we recognized that even an "understanding with tangible benefits" may implicate credibility and trigger *Brady* obligations. *Gollehon*, ¶ 14. *Gollehon* otherwise is distinguishable for two reasons. First, it addressed alleged promises

by the prosecutor, not whether there was evidence of an *expectation of* a benefit. *Gollehon*, ¶ 25. Indeed, it appears that Gollehon conceded the benefit was gratuitous and post-trial. *Gollehon*, ¶ 12. This is different from Temple, who asserts that Ferguson expected (or understood) that she would receive a benefit for her testimony based partly on the AUSA's general practices. Second, *Gollehon* dealt with benefits all within the same criminal justice system, not potential cross-jurisdiction benefits for a witness's testimony. *Gollehon*, ¶¶ 11-12.

¶22 Here, Temple asserts that the expectation that Ferguson would receive a benefit is favorable evidence the State was obligated to disclose. The facts to support an expectation of a benefit are not as strong as in other cases. *E.g. Bagley*, 473 U.S. at 671, 105 S. Ct. at 3377-78 (witnesses had signed a contract form for payment); *Giglio*, 405 U.S. at 153, 92 S. Ct. at 765 (prosecutor promised immunity if a witness cooperated); *Wearry*, 577 U.S. at 390, 136 S. Ct. at 1004 (evidence that defendant had requested a reduction in sentence if he testified and officer stated that he would speak with the prosecutor). There was no evidence that Ferguson had been promised that AUSA Betley would seek a reduction in her sentence. But AUSA Betley did testify that her general practice was to file a motion recommending a sentence reduction if a witness "provided substantial assistance." AUSA Betley also acknowledged that "it's fair to say [that a defendant] would expect something" if the assistance is substantial, but she was always clear that her office would evaluate the assistance and could never make any promises to a defendant. She further testified that although she did not remember specific conversations, based on her recollection of

11

standard practices, she would have communicated to Ferguson's federal defender that her office would evaluate what Ferguson told law enforcement, and if they considered that to be substantial assistance, would make a recommendation to the court and file motions for a sentence reduction. Ferguson said nothing about any of this when she represented to Temple's attorney that she would not receive a benefit for her testimony.[4] Two weeks after Temple's trial, AUSA Betley filed a motion for sentence reduction that identified the help Ferguson had provided in various cases—including Temple's.

¶23 Circumstances where the witness simply hoped for a benefit may not constitute impeachment evidence subject to *Brady* disclosure. *See Williams v. Woodford*, 384 F.3d 567, 597 (9th Cir. 2004) (reasoning that the facts and circumstances show only that the witness testified "in the hope that his testimony would result in a reduced sentence" and failed to establish an agreement between the witness and state). The post-trial filing of a motion—without more—may not always evidence a pre-trial understanding of a benefit. Unlike *Williams*, though, the testimony indicates that AUSA Betley would have communicated to Ferguson's public defender that she would review Ferguson's assistance to determine if she would file a motion for a sentence reduction. The prosecutor asked Ferguson, "Has the U.S. Attorney's Office given you any deals to testify today?" Ferguson responded: "No." This appears to have been not untrue as far as it went. But AUSA

---

[4] Temple's counsel presented evidence of a letter from Ferguson in a separate federal court case in 2006 seeking a sentence reduction under Rule 35(b). This letter demonstrates Ferguson's understanding of the Rule 35(b) process and supports Temple's position that Ferguson expected a similar benefit here. For reasons discussed below, however, we conclude that the 2006 letter was not possessed and suppressed by the State.

Betley's testimony suggests that, if the state prosecutor had inquired, she would have learned of AUSA Betley's general practice with Rule 35(b) motions. The record does not establish definitively that Ferguson expected this benefit. But her definitive answer to the prosecutor's question could misleadingly have "induced defense counsel to believe" that Ferguson could not be impeached based on "bias or interest arising from inducements offered by the Government." *Bagley*, 473 U.S. at 683, 105 S. Ct. at 3384. Under these circumstances, the potential expectation of a Rule 35(b) motion would be evidence favorable to the accused.

**Suppression of the evidence**

¶24 The second, more difficult inquiry here asks whether the state prosecutor suppressed evidence regarding Ferguson's expectation of a benefit. Prosecutors have an ongoing and affirmative duty to disclose evidence. *State v. Ilk*, 2018 MT 186, ¶ 34, 392 Mont. 201, 422 P.3d 1219. Suppression of the evidence may be found "irrespective of the good faith or bad faith of the prosecution." *Giglio*, 405 U.S. at 153, 92 S. Ct. at 766. Prosecutors are responsible for all information within their offices and any evidence possessed by investigating agencies or anyone working on behalf of the office (such as police) regardless of the prosecutor's actual knowledge. *Giglio*, 405 U.S. at 154, 92 S. Ct. at 766; *Ilk*, ¶ 34 (quoting *Kyles v. Whitley*, 514 U.S. 419, 437, 115 S. Ct. 1555, 1567 (1995)) (This includes a duty "to learn of any favorable evidence known to the others acting on the government's behalf in the case, including police."); *McGarvey v. State*, 2014 MT 189, ¶ 16, 375 Mont. 495, 329 P.3d 576 (overruled in part on other grounds by *Severson*, ¶ 16 n.5) (quoting

13

§ 46-15-322(4), MCA) ("In examining whether the State possessed and suppressed evidence, '[t]he prosecutor's obligation of disclosure extends to material and information in the possession or control of members of the prosecutor's staff and of any other persons who have participated in the investigation or evaluation of the case.'"). "As a general rule, the State's obligation to disclose information under *Brady* does not impose a duty on the prosecutor or investigators to learn of information possessed by other jurisdictions or agencies that have no involvement in the investigation or prosecution at issue." *McGarvey*, ¶ 16.

¶25 Recognizing the federal prosecutor as a separate, distinct entity, the District Court reasoned that Rule 35 motions are sealed and not accessible to the public, including the Cascade County Attorney. It further reasoned that a "Rule 35 motion is at best an opportunity for a posttrial benefit, not a pre-trial agreement . . . and even if it had been available to the State to disclose, failure to disclose it would not have been a *Brady* violation." Temple asserts that AUSA Betley participated in the investigation and evaluation of Temple's case, evidenced by her presence at the March 2019 interview, arranging Ferguson's presence as a witness, and communicating with Cascade County for Ferguson's transport.[5] The State stresses that Temple failed to show any agreement or understanding that could be imputed to Deputy County Attorney Fuller. It also asserts that

---

[5] Temple also argues that AUSA Betley's testimony from the postconviction relief hearing shows that "Cascade County law enforcement knew" about the Rule 35(b) motion. The only finding that the District Court made regarding Detective Hinchman's testimony was that he denied offering any benefits to Ferguson. Having reviewed the entire transcript from the hearing, including this testimony, we do not find the testimony supports Temple's assertions.

14

Deputy County Attorney Fuller had no obligation to "search for information known or possessed" by AUSA Betley because the federal prosecutor was not involved in Temple's state prosecution and any information surrounding an anticipated Rule 35 motion cannot be imputed to the State through "constructive" possession or knowledge.

¶26 Here, the record does not show actual knowledge by the county prosecutor on the possibility of a Rule 35(b) motion or process. Plainly, though, the expectation of a motion to reduce a sentence in exchange for testimony would be a benefit that goes to a witness's motivation for testifying, thus implicating *Brady*. *See Wearry*, 577 U.S. at 394, 136 S. Ct. at 1007. If the State possessed this information, it would be obligated to disclose it. The relevant question here is whether—on this record and even if Ferguson expected a benefit from the AUSA (the federal prosecuting office)—Temple can impute knowledge of that expectation to the county attorney (the state prosecuting office).

¶27 Although not cited by either party, *United States v. Risha*, 445 F.3d 298 (3rd Cir. 2006), proves helpful. In *Risha*, a federal prosecutor had no actual knowledge of the witness's expectations or of a pending plea agreement on state court charges. *Risha*, 445 F.3d at 299. The witness's state charges were postponed until after the defendant's federal trial—presumably because of his cooperation—and the witness ultimately received only probation on the state charges. *Risha*, 445 F.3d at 299. The federal prosecutor in his closing argument stressed that the witness had "nothing to gain by testifying" and no reason to lie. *Risha*, 445 F.3d at 300. The Court of Appeals asked "whether cross-jurisdiction constructive knowledge can be imputed to the federal prosecution because of close

15

involvement between the federal prosecution and state agents, or because impeachment information may have been 'readily available[.]'" *Risha*, 445 F.3d at 299. It concluded that under "certain fact findings, such knowledge might be imputed." *Risha*, 445 F.3d at 299. The question was whether the federal government was obligated to disclose that the witness expected "leniency and a forthcoming plea agreement in the state charges against him." *Risha*, 445 F.3d at 300.

> It appears that in addressing the issue of cross-jurisdiction constructive knowledge, most courts of appeals have looked to the same questions that we have. Those questions include: (1) whether the party with knowledge of the information is acting on the government's "behalf" or is under its "control"; (2) the extent to which state and federal governments are part of a "team," are participating in a "joint investigation" or are sharing resources; and (3) whether the entity charged with constructive possession has "ready access" to the evidence.

*Risha*, 445 F.3d at 304. The court remanded the case for further factual findings as to whether a finding of constructive knowledge was appropriate. *Risha*, 445 F.3d at 306.

¶28 Here, unlike *Risha*, there was an evidentiary hearing at which these questions were explored. Deputy County Attorney Fuller stated that she did not know there was a possibility of benefits from Ferguson's testimony and that she did not talk to anybody about "making a deal" for Ferguson. AUSA Betley testified that although she did not remember the specifics of the conversation, standard practice was that she would have told Ferguson's federal defender that the AUSA would evaluate what Ferguson told law enforcement and, if that was substantial assistance, file the appropriate motions recommending a sentence reduction. She also testified that these motions are very common, especially "in narcotics cases, because so many of the cases are intertwined in a way." AUSA Betley testified that

16

she did not remember how it came about that Ferguson was going to testify in a state court trial and it was not often that those instances occurred. From her recollection, if there was a request from a county attorney's office, she would have directed them to go through the U.S. Marshals Service to obtain transportation. AUSA Betley stated that she did not know the content of Ferguson's testimony or what Temple's trial was about. She had no idea what Temple's charge was and would simply have heard that Ferguson testified.

¶29 The record does not contain evidence to support a finding that federal and state agencies were engaged in a coordinated investigation that led to the separate charges against Ferguson and Temple. Detective Hinchman testified he did not approach Ferguson to cooperate but that all "this stuff came through from her attorney, Jason Holden"; he was present for Ferguson's interview; he could not remember who arranged the interview, but his work with the detention center allowed a faster scheduling time for the interview; and he did not know what the motivation was behind Holden reaching out. Detective Hinchman was part of a multi-agency drug task force that included the Great Falls Police Department, the Cascade County Sheriff's Office, and a federal agent from Homeland Security. During counsel's closing argument, the court observed that the record did not show that the Homeland Security agent was involved in Temple's case.

¶30 Although the State is not obligated to assist the defendant in procuring favorable evidence, *Severson*, ¶ 25, *Brady* does not allow the prosecution to ignore what it is obligated to disclose. *Strickler*, 527 U.S. at 280, 119 S. Ct. at 1948 (suppression may occur irrespective of good faith of the prosecution); *Giglio*, 405 U.S. at 154, 92 S. Ct. at 766 ("To

17

the extent this places a burden on the large prosecution offices, procedures and regulations can be established to carry that burden and to insure communication of all relevant information on each case to every lawyer who deals with it."); *Amado v. Gonzalez*, 758 F.3d 1119, 1136-37 (9th Cir. 2014) (overruling a due diligence requirement by the defense and reasoning that prosecutors have a broad duty and obligation in disclosure); *United States v. Price*, 566 F.3d 900, 909 (9th Cir. 2009) ("Because the prosecution is in a unique position to obtain information known to other agents of the government, *it may not be excused from disclosing what it does not know but could have learned.*") (emphasis in original) (citation omitted).

¶31    Rule 35(b) motions are sealed to the public.  It is unclear from the record whether the state prosecutor could have confirmed with the federal prosecutor whether Ferguson— the state's witness—might receive any benefits for testifying, had she inquired.  At this point, the record indicates that the federal prosecutor would have informed her of—at the very least—the general Rule 35(b) process.  The record here does not show, however, that the federal prosecutor was an agency working "on behalf of" the state prosecutor.  *See Ilk*, ¶ 34.  Though another case may provide sufficient evidence, this record does not show a joint investigation such that knowledge of the proceedings in the federal case may be imputed to the State.  *See Risha*, 445 F.3d at 304.  AUSA Betley's participation in the March 2019 interview and the relevant information from the interview were disclosed to Temple's counsel.  Detectives Hinchman's and Lynch's general participation in joint task forces similarly does not provide sufficient evidence that in this case, there was such a level

of collaboration to impute Ferguson's expectation of a benefit to the detectives (and thus, the prosecutor).

¶32 Finding *Risha* persuasive, we do not foreclose the possibility that there may be a case where cross-jurisdiction constructive knowledge may be imputed from a federal prosecutor to a state prosecutor. Based on the record evidence here, however, this case does not show that any expectation of a benefit Ferguson had may be imputed to the county attorney. As Temple's counsel acknowledged to the District Court, it would need to "read between the lines" to make that determination. *See McGarvey*, ¶ 20 ("Unsupported allegations and conclusions are not a basis for granting postconviction relief.")[6]

**Materiality**

¶33 Most dispositive in our analysis is the materiality element (or whether prejudice ensued). We do not automatically "require a new trial whenever a combing of the prosecutors' files after the trial has disclosed evidence possibly useful to the defense but not likely to have changed the verdict." *Giglio*, 405 U.S. at 154, 92 S. Ct. at 766 (citation and internal quotation marks omitted). Evidence is "material" under *Brady* "when there is

---

[6] Temple argues that three other pieces of evidence were impeachment evidence subject to *Brady* disclosure: (1) a sentence reduction that Ferguson received prior to sentencing in her case (but that did not involve Temple); (2) a letter from 2006 in a different case by Ferguson requesting a Rule 35(b) sentencing reduction; and (3) redacted portions of the March 2019 interview. Deputy County Attorney Fuller testified that the redacted portions were related to Ferguson's safety concerns while in jail, which the context of the transcript confirms. We also do not find that the first two items were possessed and suppressed by the State. Neither document relates to Temple's case or to benefits to Ferguson from her testimony in Temple's case. "[P]rosecutors are not required to undertake a 'fishing expedition' in other jurisdictions to discover impeachment evidence." *Risha*, 445 F.3d at 304.

a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." *Smith v. Cain*, 565 U.S. 73, 75, 132 S. Ct. 627, 630 (2012). "A reasonable probability does not mean that the defendant 'would more likely than not have received a different verdict with the evidence,' only that the likelihood of a different result is great enough to 'undermine[] confidence in the outcome of the trial.'" *Smith*, 565 U.S. at 75-76, 132 S. Ct. at 630 (quoting *Kyles*, 514 U.S. at 434, 115 S. Ct. at 131); *accord Severson*, ¶ 29.

¶34 Temple argues that Ferguson was crucial to the prosecution's case; that her testimony was "the only source of the most damaging evidence offered against Temple" (including the evidence that he distributed over ten pounds of methamphetamine); and that she was the only witness supporting the prosecution's theory that Temple engaged in a continuous course of conduct dealing drugs between July 2017 and February 2018. He further highlights testimony by Temple's defense attorney that he did not have a way to impeach Ferguson. The State counters that Ferguson's testimony was corroborative but did not "establish any element of distribution of dangerous drugs."

¶35 Contrary to other cases in which the witness provided the only evidence to establish a key part of the government's case, Temple does not address the six other witnesses who testified at his trial. *Cf. Wearry*, 577 U.S. at 392-93, 136 S. Ct. at 1006 (the state's evidence resembled a "house of cards, built on the jury crediting" the witness account rather than defendant's alibi); *Giglio*, 405 U.S. at 151, 92 S. Ct. at 764 (the state's key witness was the only witness linking the defendant with the crime). Lohmeyer, Wilson,

and Osborn all testified that Temple had sold drugs (either to them or to others) at various times. In other words, at least three other witnesses at trial all testified to the required elements to convict Temple. The State's closing arguments reveal that its case relied heavily on Wilson's and Lohmeyer's testimony to prove that Temple sold drugs. The jury also already knew that Ferguson was getting a benefit for her testimony—immunity from any state charges. So, it is not clear that the knowledge of an additional potential benefit would have impacted its consideration of her testimony. Viewing the materiality of the evidence in the context of the entire record, *United States v. Agurs*, 427 U.S. 97, 112, 96 S. Ct. 2392, 2402 (1976), we are not convinced that even if the jury knew that Ferguson might receive a sentence reduction in her federal case it would undermine our confidence in the outcome, *see Severson*, ¶ 29.

> *2. Did the State violate* Brady *when it failed to inform defense counsel prior to sentencing that the witness had received a reduction in her sentence for her trial testimony?*

¶36   Temple next asserts that the State suppressed impeachment evidence at sentencing because the federal judge in Ferguson's case had by that time granted AUSA Betley's Rule 35(b) motion, which included (among other assistance) Ferguson's testimony at Temple's trial. The District Court concluded that this claim was record-based and that no evidence at the hearing showed that Ferguson testified falsely.

¶37   We agree with Temple that the question under *Brady* is not whether Ferguson's testimony was false, but rather whether it was evidence that could be used to impeach her credibility. *Severson*, ¶ 18. We similarly agree that the claim is not record-based. "When a petitioner has been afforded the opportunity for a direct appeal of the petitioner's

21

conviction, grounds for relief that were or could reasonably have been raised on direct appeal may not be raised, considered, or decided in a proceeding" for postconviction relief. Section 46-21-105(2), MCA. Temple did not become aware of Ferguson's sentence reduction until months after his direct appeal had been denied, and the State does not claim that he should have known about the issue sooner. This information was not part of the record on direct appeal. Without this information, his claim could not "reasonably have been raised on direct appeal[.]" Section 46-21-105(2), MCA.

¶38 For similar reasons as stated above, however, we do not find a *Brady* violation. Under the third factor, it does not "undermine our confidence" in the court's sentencing. *Severson*, ¶ 29. In its sentencing order, the District Court did consider that Temple "was convicted of distributing over ten pounds" of methamphetamine, but it also reasoned that two other judges previously designated Temple as a persistent felony offender in separate felonies, that this conviction was his seventh felony, the impact of illegal drugs in the community, and its inability to condone the sale or distribution of drugs. Having designated Temple as a persistent felony offender, the court thus sentenced him to thirty years with ten suspended. *See* §§ 45-9-101, 46-18-502, MCA (sentencing statutes for criminal possession of dangerous drugs and persistent felony offenders). Given the ample other considerations that the District Court relied on in sentencing, Temple has not shown a "reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Kyles*, 514 U.S. at 433-34, 115 S. Ct. at 1565 (citation omitted).

¶39    *3. Did the State violate due process when it failed to correct the witness's testimony at trial?*

¶40    The government violates constitutional due process guarantees when it knowingly presents false evidence or allows known false evidence to go uncorrected. *Napue v. Ill.*, 360 U.S. 264, 269, 79 S. Ct. 1173, 1177 (1959).

¶41    Unless the error is structural, to succeed on a *Napue* claim, "the defendant must show that the testimony or evidence was actually false, that the prosecution knew or should have known that the testimony or evidence was actually false, and that the false testimony or evidence was material." *State v. Wright*, 2011 MT 92, ¶ 28, 360 Mont. 246, 253 P.3d 838 (citing *Hayes v. Brown*, 399 F.3d 972, 984 (9th Cir. 2005)). In assessing materiality, the question is not "whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Hayes*, 399 F.3d at 984 (quoting *Kyles*, 514 U.S. at 434, 115 S. Ct. at 1566).

¶42    The District Court found that Temple failed to show Ferguson testified falsely about benefits she would receive, and for reasons similar to his *Brady* claim, his *Napue* claim failed. Temple argues that the court erred in determining that Ferguson did not testify falsely, that *Napue* requires only that the prosecutor should have known about the false testimony, and that AUSA Betley's knowledge about Ferguson's expectation of benefits should be imputed to the county attorney.

¶43    Regardless of whether Ferguson testified falsely, Temple's *Napue* claim is resolved under the second and third factors. For the same reasons discussed above, the record does

not show that Ferguson's expectation of a benefit in the federal case may be imputed to the county attorney or that the prosecutor should have known her testimony was false. *See Wright*, ¶ 28. Similarly, under the third factor, the verdict remains worthy of confidence based on the supporting testimony from Lohmeyer, Osborn, Wilson, and the detectives surveilling the controlled transactions. *See Hayes*, 399 F.3d at 984.

## CONCLUSION

¶44 For the foregoing reasons, we affirm the District Court order denying Temple's petition for postconviction relief. Based on the record presented and given the lack of materiality, we conclude that the State did not violate its *Brady* or *Napue* obligations.

/S/ BETH BAKER

We Concur:

/S/ CORY J. SWANSON
/S/ JAMES JEREMIAH SHEA
/S/ LAURIE McKINNON
/S/ INGRID GUSTAFSON